IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 21, 2018 Session

**IN RE RILEY W.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 276891     Robert D. Philyaw, Judge**

_____

**No. E2017-01853-COA-R3-PT**
_____

Lindsey W. ("Mother") appeals the September 25, 2017 order of the Juvenile Court for Hamilton County ("the Juvenile Court") terminating her parental rights to the minor child Riley W. ("the Child") upon the grounds of substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). We find and hold that grounds for terminating Mother's parental rights to the Child pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3) were proven by clear and convincing evidence and that it was proven by clear and convincing evidence that the termianation was in the Child's best interests. We, therefore, affirm the September 25, 2017 order of the Juvenile Court terminating Mother's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

David C. Veazey, Chattanooga, Tennessee, for the appellant, Lindsey W.

Herbert H. Slatery, III, Attorney General and Reporter; and Erin A. Shackelford, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

## OPINION

## Background

The Child was taken into State custody in June of 2016 after being born drug-exposed and was subsequently adjudicated dependent and neglected. In April of 2017, the State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Mother and John P. ("Father")[1] to the Child. The case proceeded to trial in July of 2017. Mother failed to appear at trial.

At trial, Channing Phillips, a family service worker with DCS, testified. Ms. Phillips testified that she acquired responsibility for the Child's case in October of 2016. Ms. Phillips explained that the Child had entered State custody on June 5, 2016 after DCS received a referral for a drug exposed child at birth at Erlanger. Ms. Phillips stated that Mother had drug issues.

A permanency plan ("the Permanency Plan")[2] initially dated in July of 2016 was created for the Child. Ms. Phillips testified that a permanency plan meeting was held on October 11, 2016. At that meeting, the Permanency Plan was reviewed, and Mother signed the statement of responsibilities. Ms. Phillips explained that although the Permanency Plan was in place when she took over the case, Mother did not sign the statement of responsibilities until the October meeting. Under the Permanency Plan, Mother was to have an A&D assessment and follow the recommendations of the assessment, submit to drug screens and verify sobriety, refrain from using illegal substances and from abusing legal substances such as alcohol and prescription medications, participate in domestic violence classes or counseling, work with in-home service providers on maintaining good parenting skills and making sure her home is clean and safe, provide proof of legal verifiable income, resolve legal issues and not obtain any new legal charges, stay in contact with DCS, visit the Child regularly, and maintain housing for three consecutive months, among other things. Ms. Phillips was asked if Mother ever indicated that she did not understand her responsibilities under the Permanency Plan, and Ms. Phillips stated: "No, [she] always - - [she] knew what was on it and what [she] needed to do."

Ms. Phillips testified that Mother eventually did have an A&D assessment. The recommendation of the A&D assessment was for Mother to attend an intensive out-

---

[1] The September 25, 2017 order terminated Father's parental rights to the Child. Father did not appeal the termination of his rights.

[2] The initial Permanency Plan was updated, but other than removal of the requirement for the parents to participate in domestic violence classes, the parents' responsibilities remained substantially similar under the revised plan. As such, for ease of reading, in this Opinion we refer simply to the Permanency Plan.

patient program at the Council for Alcohol & Drug Abuse Services ("CADAS"). At the time of trial, Mother had not even begun an intensive out-patient program.

Mother reported that she was working, and Ms. Phillips confirmed this by calling Mother's place of work. Mother, however, failed to provide a paystub or other evidence of income. Mother reported that she gets paid daily and does not have a paystub or a way to track her income.

Ms. Phillips testified that Mother did submit to random drug screens, but tested positive for illegal substances. Ms. Phillips stated that Mother disputed the failed drug screens. Ms. Phillips explained:

> [Mother] would always have an excuse for the drug screens. She would say maybe she was kissing [Father] and that's how she was positive for certain things, or maybe it was the house she was living in. You know, she had different excuses. Or maybe the drug test was wrong.

To Ms. Phillips knowledge, Mother never had an independent drug screen done.

Mother failed to provide proof of housing. Ms. Phillips testified that stability has been a problem for Mother. Since Ms. Phillips has had the case, Mother has had three or four different addresses. Mother gave one address as a mailing address, but has never lived at that address. Ms. Phillips stated that at one time Mother reported that she had a place and that she was going to be able to pay rent and have a lease. Ms. Phillips requested a copy of the lease, but Mother never provided one. The last time Ms. Phillips spoke with Mother, Mother reported living with a friend.

Ms. Phillips occasionally supervised visitation between Mother and the Child and "would try to be in the office when the visits were going on so [she] could step in and see kind of what was going on." Ms. Phillips did not have any concerns about the visitations themselves. She stated that Mother brought snacks, fed the Child, and changed the Child's diaper.

Ms. Phillips was asked what she did to assist Mother, and she testified that she made several A&D appointments for Mother; provided bus passes; gave her resources for grief counseling and parenting classes; followed up with Transformation Project, which the previous caseworker had tried to get Mother into; followed up with Sound Living Counseling; searched for Section 8 housing and mailed in an application for housing; typed up a referral for Mother for Chattanooga Community Kitchen for services; provided flyers for a health clinic, domestic violence classes, and a financial program; and gave Mother a referral for a Room at the Inn. When Mother could not get in to a

Room at the Inn due to her lack of identification, Ms. Phillips directed Mother on how to go to the Department of Motor Vehicles and obtain an identification card.

Mother did complete the A&D assessment and went to the first intake appointment for counseling. Ms. Phillips, however, does not believe that Mother has made enough progress for the Child to be placed in her care. Ms. Phillips has concerns about Mother's drug use, her failure to complete an intensive out-patient program, her lack of stable housing, her lack of verifiable income, and an incident that occurred during a visitation. Ms. Phillips would not be comfortable allowing Mother unsupervised visitation.

Ms. Phillips testified that the Child is placed with a foster family and is doing well. The Child is healthy and exhibits no developmental delays. She attends daycare and is walking and starting to run. Ms. Phillips testified that the Child does not appear to have any lingering effects from the drug exposure at birth. Ms. Phillips believes it is in the Child's best interest for Mother's rights to be terminated.

Katharine Wolfe Blackwell, a transporter for DCS, testified at trial. She has been a transporter for almost 18 years. Ms. Blackwell transports the Child and supervises the visitations. Ms. Blackwell began supervising the Child's visitations on October 11, 2016, and her last visit was July 11, 2017. Ms. Blackwell testified that in total she supervised 34 visits. Of those 34 visits, Mother attended 23 and missed 11.

Ms. Blackwell had no concerns about Mother's interactions with the Child during visitation. Ms. Blackwell stated: "Interaction was appropriate and she met the child's needs about feeding her and changing her and hold her and everything." Mother would bring snacks for the Child and has brought a stuffed animal to the visits.

Ms. Blackwell did have concerns, however, about a serious incident that occurred during one visit. She described the visit stating:

> That was July the 11th. We were going to be off on July the 4th. So on a visit of June the 27th I asked [Mother] if we could do a two-hour visit on July the 11th, because we were going to be off on the 4th, the day of her visit. And so we both agreed that we would do it from 9:00 to 11:00.
>
> So on July the 11th she came in and visitation went as it always has. And [the Child] became kind of fussy, and so [Mother] asked me if she could bring her outside the visitation room and walk her up and down in front of the visitation room. And in the past, I agreed to let her do it, because when [the Child] has to have a lot of things that she can focus on. I mean, she's very smart. And so [Mother] was outside. She was walking up

4

and down in front of the visitation room. And she asked me what time it was. And I told her it was approximately 10:27. And she stated that she needed to get out of there. She needed to get to work. Which I thought was very odd, because it was a two-hour visit. And regular visits is 10:00 to 11:00 scheduled, so I didn't understand why, you know, she wasn't going to do her two hours.

So [Mother] bent over in front of my cube in the - - I'm sorry - - in the visitation room to pick up her child and a toy. And when she stood up and walked off, I saw a piece of paper right where she was standing. And so I went over. I picked the paper up. And I opened it up. And there was powder and crystals that was inside the paper. There were no active visits going on in the office at the time. Her visit was the only one.

There was a case manager in my cube at the time. And I asked her if she could stay in the cube so I could see if I could find the case manager. She was in a meeting. So I went and washed my hands. Got a dry paper towel. Put the paper in it. Took it back to my cube. Hid it. Got [the Child] and we left. [Mother] also followed me out. I text the case manager to let her know that I found a powdery substance in a piece of paper that was right in the same spot that [Mother] was standing in.

Mother did not see Ms. Blackwell find the piece of paper because Mother had her back to Ms. Blackwell at the time. Ms. Blackwell testified that she does not know what was in the paper.

Ms. Phillips testified that she received the text from Ms. Blackwell, retrieved the paper from where Ms. Blackwell had hidden it, notified her supervisor, and then called the police. Ms. Phillips tried to email Mother to let Mother know that they needed to speak about the incident. Ms. Phillips stated:

She e-mailed me back. It's like she wanted to talk about it over e-mail. I felt like it was best that we talked about it over the phone due to the fact that we were advised not to have any more visits after that. Once I spoke to her on the phone - - I called her at the new number that she gave me -- she got very agitated. She asked if we had any cameras in the DCS office. I said no. I told her to talk to David, her attorney, because David already knew about it. And she said that she didn't understand why we were blaming her and that she believed that Kathy planted it for -- on -- for [Mother], that Kathy had it and was blaming it on [Mother]. . . . When I told her what it was, she never -- you know, it was like she was more, that's

5

just not mine. That's not mine. I didn't drop that. And then she e-mailed me back and she -- you know, that's when I forwarded her on to David and I just, you know, said please talk to David about this.

Ms. Phillips testified that the police declined to arrest Mother because Mother was not present when they collected the paper.

Kristen D. ("Foster Mom") is the Child's foster mother. The Child has lived with Foster Mom since February of 2017. Foster Mom testified that the Child is her cousin. When Foster Mom and her husband found out that the State had custody of the Child, they contacted DCS and requested to be allowed to be foster parents. Foster Mom further explained that she is related to Father. She stated, however, that she does not have a relationship with either Father or with Mother. Foster Mom testified that Father and Mother do not contact her, and she does not allow them any sort of visitation with the Child.

Foster Mom stated that her household consists of "Me, my husband, and we have another adult who lives there, Alan, who we've had guardianship of him when he was 16. He was a youth in our home. We were his youth leaders at the time. And his mom passed away so he's been with us since."

Foster Mom testified that the Child has allergies, but the Child is healthy other than that. Foster Mom testified that the Child is bonded with Foster Mom's family. Foster Mom and her husband wish to adopt the Child if the Child becomes available for adoption.

After trial, the Trial Court entered its very detailed Order Terminating Parental Rights and Order of Full Guardianship on September 25 2017, terminating Mother's parental rights to the Child after finding and holding, *inter alia*, that grounds for termination for substantial noncompliance with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) had been proven by clear and convincing evidence and that it had been proven by clear and convincing evidence that the termination of Mother's parental rights was in the Child's best interests. In the September 25, 2017 order the Juvenile Court specifically found and held, *inter alia*:

7) The subject child was born on June 5, 2016 at Erlanger Hospital. The Department received a referral alleging drug exposed child. The hospital sent out the child's meconium for accurate testing of the child's drug exposure. The results indicated that the meconium was positive for amphetamine and methamphetamine.

6

8) The mother, [Mother], used methamphetamine during her pregnancy. The Respondents resided together for the duration of [Mother's] pregnancy.

9) The subject child was placed into the protective custody of the Department on June 8, 2016.

10) On September 19, 2016, the subject child was adjudicated dependent and neglected. Specifically, the Court found that the child was exposed to the mother's drug use in utero, as the child's meconium was positive for amphetamine and methamphetamine. Further, the Court found that the parents were unable to provide a safe and stable home. At the time of the child's removal, the parents reported that they were homeless. Prior to the child entering custody, the Department had provided the parents resources for alcohol and drug treatment, drug screens, housing referrals, and resources for domestic violence classes and visitation.

* * *

12) After the subject child entered foster care, the Department developed a permanency plan on July 6, 2016 to assist the family in reunifying the child with the family. The Court later ratified the permanency plan finding it to be in the best interest of the child, and that the responsibilities were reasonably related to the reason for foster care. . . .

13) On January 18, 2017, the Department developed a second permanency plan to assist the family in reunifying the child with the family. The Court later ratified the permanency plan finding it to be in the best interest of the child and that the responsibilities were reasonably related to the reason for foster care. The permanency plan required that the Respondents comply with the same responsibilities as the permanency plan dated July 6, 2016, with the exception of the requirement to attend domestic violence classes.

14) Both parents signed a Statement of Responsibilities on October 11, 2016 and January 31, 2017. They signed the Criteria and Procedures for Termination of Parental Rights on October 4, 2016 and January 31, 2017, acknowledging that the contents of the documents were explained to them and that they were aware that failure to take certain steps could result in termination of their parental rights. FSW Phillips testified that she reviewed the plans with the parents, and that they understood what their responsibilities were on the plans.

15) FSW Phillips testified that [Mother] has not completed her responsibilities on the plan, and that she has made little to no progress on the plan since the child entered custody in June 2016. After the second permanency plan was developed, [Mother] finally had an alcohol and drug assessment at Bradford Health Services. Notably, [Mother] had failed to

appear at two (2) prior appointments that FSW Phillips had scheduled for her. Bradford recommended that [Mother] complete an intensive outpatient program (IOP) at Council for Alcohol & Drug Abuse Services (CADAS). However, FSW Phillips testified that [Mother] has not started IOP at this time.

16) FSW Phillips testified that [Mother] reported that she was employed. While FSW Phillips received verbal confirmation of [Mother's] employment, [Mother] never provided her with check stubs or other verifiable proof of income. FSW Phillips testified that [Mother] stated that she was paid cash daily and did not have any documentation that she could provide to her.

17) FSW Phillips testified that the permanency plan required [Mother] to submit to random drug screens. While [Mother] did submit to some of the drug screens requested by the Department, [Mother] disputed the results of the drug screens and often would make excuses for the results of said drug screens. [Mother] told FSW Phillips that she was positive for certain drugs because she was kissing [Father] or that it may be because of the house she was living in at the time. While [Mother] disputed the results of the Department's drug screens, she never presented the Department with proof of any negative drug screens administered by an independent, third party.

* * *

20) FSW Phillips testified that the parents have never had stable housing during this custodial episode, and that they have often reported that they live with friends. The parents' unstable living conditions hampered the initiation of any in-home services to help the family. She opined that the parents have provided her with at least three (3) or four (4) different addresses and one (1) mailing address at a residence where they have never resided. The parents have not provided the Department with a lease or any other proof of stable housing as of today's date. FSW Phillips testified that when she last spoke to [Mother], she reported that she was living with a friend.

21) FSW Phillips testified that the parents were required to attend counseling to address the grief they have experienced over the surrender of their parental rights to the subject child's two older siblings. Both parents attended the first counseling intake session, but failed to follow up with additional sessions as recommended.

22) FSW Phillips testified that the parents received supervised visitation with the child over the course of this custodial episode. However, the parents, especially [Father], were inconsistent in attending such visits.

8

23) DCS Transporter, Katherine Wolfe-Blackwell, testified that she has been responsible for transporting the child to the visits and for supervising the parents' weekly visitation at the DCS office. She testified that there were thirty four (34) scheduled visits from October 2016 to July 2017. Out of those thirty four (34) visits, [Mother] attended twenty three (23) visits and missed eleven (11) visits, and [Father] attended thirteen (13) visits and missed twenty one (21) visits.

24) Ms. Wolfe-Blackwell testified that [Mother] had appropriate interactions with the child, and that [Mother] met the child's needs during the visits by feeding her, changing her, and holding her when necessary.

25) Ms. Wolfe-Blackwell testified that she generally did not have any concerns with regard to the parents' visits. However, she became very concerned during [Mother's] last visit on July 11, 2017. Specifically, [Mother] said she needed to leave the visit early, which Ms. Wolfe-Blackwell thought was odd because it was supposed to be a two (2) hour visit that day. [Mother] bent over in the visitation room to pick up the child and a toy. When [Mother] stood up and walked off, Ms. Wolfe-Blackwell observed a piece of paper where [Mother] had been standing. Ms. Wolfe-Blackwell picked up the paper and opened it up. Ms. Wolfe-Blackwell testified that there was powder and crystals inside the paper. She testified that there were no other visits taking place in the DCS office at the time. After observing the substance, Ms. Wolfe-Blackwell attempted to locate FSW Phillips to let her know what she had found, but FSW Phillips was in a meeting at the time. Ms. Wolfe-Blackwell placed the paper on a dry paper towel and hid it in her desk, as she had to transport the child from the visit. [Mother] followed her out of the building at that time. Ms. Wolfe-Blackwell sent FSW Phillips a text message to let her know that she found a powdery substance in a piece of paper where [Mother] had been standing in the visitation room. Later, Ms. Wolfe-Blackwell found out that FSW Phillips had retrieved the piece of paper from her desk. Ms. Wolfe-Blackwell testified that while she did not know what the substance was, she was concerned because the child was so close to it.

26) FSW Phillips testified that she retrieved the paper from Ms. Wolfe-Blackwell's desk and opened it up a little bit. She said that white crystals got on her hand. She placed the paper on a glove, and then put the paper in an envelope. She contacted law enforcement, who came to retrieve the envelope for testing.

27) FSW Phillips testified that she had a meeting scheduled with [Mother] a few days later. She tried to e-mail [Mother] to let her know that she needed to speak with her by phone to discuss this incident. Eventually, FSW Phillips was able to speak with [Mother] by phone. She testified that

9

[Mother] became very agitated during their conversation. [Mother] asked if there were any cameras in the DCS office. FSW Phillips told her there are not cameras in the office, and advised [Mother] to contact her attorney, Mr. Veazey, who was already aware of the incident. [Mother] said that she did not know why the Department was blaming her, and that she believed that Ms. Wolfe-Blackwell had planted it.

28) FSW Phillips testified that after law enforcement tested and identified the substance, the Department had to close the visitation room for the rest of the day and a cleaning crew had to come in that night to clean it. She also advised the foster parents to take the child to the doctor for evaluation.

29) FSW Phillips testified that she does not believe that the parents have made enough progress to make her comfortable having the child placed in their home. Specifically, she still has concerns about the parents' ongoing drug use, as the parents have not completed IOP or any other treatment program aimed at addressing their history of substance abuse. Further, the parents do not have stable housing for the child, and the parents have not provided the Department with proof of verifiable income to demonstrate that they would be able to financially support the child. FSW Phillips opined that it would be harmful to place the child in the parents' care, considering the parents' failure to complete their responsibilities on the permanency plan.

30) FSW Phillips testified that both parents knew what their responsibilities were on the permanency plans and they knew what they needed to do to have this child returned to their care.

31) FSW Phillips testified regarding the Department's efforts to assist the parents with the completion of their responsibilities on the permanency plan. Specifically, she scheduled several appointments for the parents to complete alcohol and drug assessments at Bradford, but the parents called and cancelled those appointments or they would not show up to their scheduled appointments. FSW Phillips would have to reschedule the appointments for them. She provided the parents with resources for grief counseling and parenting classes. She followed up with the Transformation Project, which is a program that the prior DCS worker had tried getting the parents involved with earlier in the case. FSW Phillips also followed up with Sound Living Counseling, where she had referred the parents for grief counseling. FSW Phillips also gave [Mother] flyers for a health clinic in Cleveland, Tennessee, for domestic violence classes, and for the SMART program, which is a financial program. FSW Phillips provided both parents with bus passes to assist them with transportation.

32) FSW Phillips assisted the parents with the completion of an application for Section 8 housing and mailed in the application for them. She made a

referral to the Chattanooga Community Kitchen and gave it to [Mother] for her to schedule a meeting for services there. FSW Phillips also made a referral to Room at the Inn for [Mother] and a referral to the Samaritan Center for both parents. FSW Phillips testified that later [Mother] told her that she could not receive services there because she did not have proper identification (ID). Thus, FSW Phillips provided her with the number for and directions to the Department of Motor Vehicles to get her ID.

33) Out of all the resources offered to them by the Department, the parents have not availed themselves of such resources, with the exception of [Mother] completing her alcohol and drug assessment, both parents attending the first counseling intake appointment, occasional visitation, and bus passes.

34) Foster mother, [Foster Mom], testified that the subject child was placed in her family's home in February 2017. She testified that she and her husband found out that the child was in foster care and contacted the Department, as they are related to [the Child's father], who is their cousin. She testified that the child was on track developmentally when she was initially placed in their home and has exceeded from there. She testified that the child is bonded to their family, and that they wish to adopt her, should she become available for adoption.

Mother appeals the termination of her parental rights.

## Discussion

Although not stated exactly as such, Mother raises three issues on appeal: 1) whether the Juvenile Court erred in finding that grounds for terminating Mother's parental rights to the Child for substantial noncompliance with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) were proven by clear and convincing evidence; 2) whether the Juvenile Court erred in finding that grounds for terminating Mother's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) were proven by clear and convincing evidence; and, 3) whether the Juvenile Court erred in finding that it had been proven by clear and convincing evidence that the termination of Mother's parental rights was in the Child's best interests.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected

11

by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

13

receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount

to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first address whether the Juvenile Court erred in finding that grounds for terminating Mother's parental rights to the Child for substantial noncompliance with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) were proven by clear and convincing evidence. As pertinent, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (2017).

With regard to the ground of substantial noncompliance with the permanency plan, the Juvenile Court specifically found and held:

The State has established the ground of Substantial Non-Compliance with Permanency Plan, pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2), by clear and convincing evidence as to Respondents, [Mother] and [Father].

35) After the child entered custody, DCS created permanency plans for the family. The permanency plans listed a number of requirements that the Respondents, [Mother] and [Father], needed to satisfy before the child could safely be returned home. The Hamilton County Juvenile Court ratified the permanency plans as in the child's best interests and found that the requirements for the Respondents were reasonably related to the reason for foster care. This Court also finds that the responsibilities of the permanency plan were reasonably related to the reasons that necessitated foster care and in the best interest of the child.

15

36) The plans required the Respondent, [Mother], to complete the following responsibilities:

    a) [Mother] will follow recommendations from an A&D assessment and address drug use and the negative impact it has on the ability to parent effectively;

    b) [Mother] will submit to random drug screens to verify sobriety and will refrain from using any illegal substances or abusing legal substances such as, alcohol and prescription medications;

    c) [Mother] will work with the in-home service provider on maintaining parenting skills and making sure the home is clean and safe for children;

    d) [Mother] will provide DCS with proof of legal, verifiable means of income of [her] own and proof that [she is] able to adequately support [the Child];

    e) [Mother] will notify DCS when [she] secure[s] housing so that DCS can complete the necessary home study. Housing will be maintained for no less than 3 consecutive months. Proof of a lease will be provided. The home will be clean and free from drugs.

    f) [Mother] will participate in domestic violence classes and counseling to address negative impact of domestic violence on the child;

    g) [Mother] will refrain from any illegal activities or engaging with individuals who are known to participate in illegal activities or being in environments where illegal activities are taking place.

37) The Court finds that [Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. Specifically, [Mother] has not addressed her illegal drug use, as she failed to follow through with the recommendations of her alcohol and drug assessment by completing IOP; has consistently made excuses for her drug screens; has failed to obtain stable housing; and, has failed to provide proof of legal, verifiable income.

* * *

40) The Court finds that the Department made reasonable efforts to help the Respondents, [Mother] and [Father], satisfy the requirements in the permanency plans. Further, the Court finds that no progress was made by the Respondents that would make it appropriate or even possible to return this child to either of these parents' custody, despite the Department's efforts to assist the parents in completing their respective responsibilities on the plan.

16

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that grounds were proven by clear and convincing evidence to terminate Mother's parental rights to the Child for substantial noncompliance with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

Next, we consider whether the Juvenile Court erred in finding that grounds for terminating Mother's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) were proven by clear and convincing evidence. As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2017).

In the case now before us, the Juvenile Court made the following specific findings and holdings with regard to the ground of persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3):

The State has established the ground of Persistent Conditions, pursuant to T.C.A. § 36-1-113(g)(3), by clear and convincing evidence as to Respondents, [Mother] and [Father].

41) The child has been removed from the Respondents' home by Court Order for more than six (6) months, and was adjudicated dependent and neglected by the Hamilton County Juvenile Court on September 19, 2016.
42) The Court finds that the conditions that led to the removal still persist and other conditions in the home exist that likely would lead to further

17

neglect or abuse of the child. The child was exposed to the mother's drug use in utero, as the child's meconium was positive for amphetamine and methamphetamine. At the time of removal, the parents were unable to provide a safe and stable home and reported that they were homeless. The parents continue to struggle with the same issues, as they have not addressed their illegal drug use, have been unable to secure safe and stable housing of their own, and have failed to demonstrate stability over the course of this custodial episode.

43) There is little chance that those conditions will be remedied soon so that the child can be returned safely to either parent's home. The same drug use and instability issues were present when the subject child's siblings were removed from the parents in April 2015. The parents bounce around between other's [sic] people's homes and have not obtained stable housing of their own. The Respondents have put forth little to no effort to remedy their situation since the child entered custody in June 2016.

44) The Court finds that continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home. The child is currently placed in a pre-adoptive foster home with loving foster parents who are willing to adopt the child, should she become available for adoption.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that grounds were proven by clear and convincing evidence to terminate Mother's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Finally, we consider whether the Juvenile Court erred in finding that it had been proven by clear and convincing evidence that the termination of Mother's parental rights was in the Child's best interests. With regard to making a determination concerning a child's best interests, our Supreme Court recently instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at

18

861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In making its best interests analysis, in its September 20, 2017 order, the Juvenile Court specifically found and held:

50) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Mother] and [Father], have failed to

make a lasting adjustment of their circumstances to make it safe and in the child's best interest to be placed in their care.

51) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Mother] and [Father], have failed to make a lasting adjustment of their circumstances after the state has made reasonable efforts to help them for such duration of time that lasting adjustment does not reasonably appear possible.

52) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Mother] and [Father], have not maintained regular, consistent visitation with the subject child and because they have no meaningful relationship with the child. One of the things the parents could have done to show their desire to be in the child's life was to visit. [Mother] only visited the child about two thirds of the dates scheduled and [Father] only visited about one third of his available opportunities. The Court finds that these parents were friends with whom the child played, but did not have any relationship beyond that of any other adult friend.

53) The Court finds, pursuant to T.C.A § 36-1-113(i), that it is in the best interest of the child for termination to be granted as to Respondent, [Mother], because she has abused or neglected the subject child by exposing the child to illegal drugs in utero.

54) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as a change of caretakers and home would have a highly negative effect on the child. The child is placed in a loving, pre-adoptive home. The child is thriving in that home and is bonded to her foster family.

55) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, because Respondents, [Mother] and [Father], abuse drugs, rendering them consistently unable to care for the child in a safe and stable manner. The parents have a history of drug abuse, which they still have not addressed to date.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court. Furthermore, we find no error in the Juvenile Court's determination that the combined weight of the factors presents clear and convincing evidence that it is in the Child's best interests for Mother's parental rights to be terminated.

As grounds for terminating Mother's parental rights to the Child were proven by clear and convincing evidence, and it was proven by clear and convincing evidence that the termination of Mother's parental rights to the Child is in the best interests of the Child, we affirm the Juvenile Court's September 25, 2017 order terminating Mother's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Lindsey W.


_____
D. MICHAEL SWINEY, CHIEF JUDGE